## Di Giacomo v. The Pennsylvania Railroad Company

*Ned Stein,* for plaintiff.

*Robert M. Landis* and *F. Hastings Griffin, Jr.,* for defendant.

PARRY, J., November 24, 1953.—Plaintiff brought suit to recover from the carrier at destination the value of a carload of lettuce consisting of 318 crates which the complaint alleged were of good quality, and were shipped in good condition from Tipton, Calif., to Kansas City, Mo., whence the car was reconsigned to plaintiff at Philadelphia, where it was tendered for delivery by defendant in such bad order and condition as to be worthless. The negligence averred was failure to use due care, delay in transit and defective equipment. That the value of the cargo was $1,908 and, deducting transportation charges of $649.98, the loss to plaintiff owner was $1,258.02, which he claimed with interest.

This pleading leaves much to be desired. As this was an interstate shipment, liability could not be asserted as at common law for the parties were bound by the Federal legislation in force. Plaintiff had to claim under an act of Congress, declare upon a contract the terms of which were strictly prescribed by statute and attach a copy of it to his complaint. As

the shipment was perishable, it was governed by a special tariff having the force of law, which should have been pleaded, as tariffs in effect at the date of shipment were incorporated, by reference, in the contract.

The complaint does not refer to any act of Congress. Exhibit A, which purports to be a copy of the bill of lading, omits all its conditions limiting liability and makes no reference to relevant tariffs. Such inaccurate and insufficient pleading is not only misleading but is a patent violation of our rules. However, the answer supplied the missing part of the bill of lading and the parties went to trial.

Plaintiff's proof in support of his averments is rather meagre. He had first the burden of showing delivery in good order to the carrier at origin, then bad order at destination and the resulting damages. If he brought evidence tending to prove these facts, as a general rule the case would go to the jury. This is elementary, and it was quite unnecessary for his counsel to supply us with such a wealth of authority on the point.

Plaintiff made no attempt to show by direct proof that the carrier breached the contract but relied upon the general rule. Assuming for the moment that he was entitled to do so, some analysis of the testimony is required to determine whether he was successful.

The proof at origin is supplied only by entries on the bill of lading and a report by a Government inspector, admitted by agreement. The bill of lading shows that the shipper loaded the car, put 15,000 pounds of ice over the crates in the body of the car, put nothing in the ice bunkers, closed the vents and instructed the carrier to fill the bunkers at the first icing station it reached and not to re-ice thereafter.

The inspection certificate shows, inter alia, that in one half the crates there was from two percent to three

percent slimy decay, affecting the compact portion of the heads of lettuce. In the other half of the crates, no decay, so the inspector averaged the contents of the cases at one percent decay and thus brought the defects within the Department of Agriculture grade tolerance, so he rated the consignment U. S. No. 1.

The carrier had no notice of the condition of the lading; it received and receipted for a closed car said to contain 318 crates of lettuce, contents and condition of contents unknown.

To prove that one half of a perishable shipment is tainted with incipient decay, we think, falls short of meeting the burden upon plaintiff to show delivery to the carrier in good order.

We come then to the proof at destination. The car arrived and was placed for delivery late at night on May 1st and an arrival notice was sent plaintiff early in the morning of May 2nd in time for sale at that day's market. We may say here that the charge of delay in transit was abandoned, and it was admitted that the car made an expeditious movement. In any event, the carrier's duty was not to comply with any particular schedule of trains or delivery in time for any particular market, but merely to transport with reasonable dispatch.

At 1 p.m. on May 2nd, a Government inspector issued his certificate showing, inter alia, that the lettuce "now fails to grade U. S. No. 1 due to decay and tipburn". "Condition generally fresh and crisp, in most samples none, in many 5 percent to 10 percent average, 3 percent tipburn, in most samples 15 percent to 30 percent, in some none, average 16 percent decay. Bacterial soft rot generally affecting compact portions of head."

However, he appended a statement under the head of remarks that his inspection and certificate were restricted to two rows and four stacks on one side of

the car near the door. As the car was not unloaded, the inspection had necessarily to be confined to the superficial area at the door for the lading was five rows deep. There was still from 12 to 15 inches of crushed ice over the crates; the temperature at the doorway, top and bottom, was 35 degrees; the hatch covers were closed; the plugs in and the bunkers filled with ice to within one to one and a half feet of the top.

Plaintiff then sent an inspector employed by him to make a check. He only inspected three crates at the door, found one all right, another 12 percent and another 18 percent affected by decay. He thereupon averaged the 318 crates as damaged 10 percent. He found the temperature at the door at 36 degrees top and bottom. On May 5th he was sent to make another inspection and to see if there were any defects in the equipment. He found an increase of decay in the crates inspected of from 16 percent to 44 percent decay. He, therefore, averaged the car 30 percent decayed. He also found slight cracks in the plugs to the bunkers admitting light. The bunkers were three quarters full of ice or better and the temperature in the car at the door, top and bottom, was still 36 degrees. On that day, plaintiff refused to accept the car.

Plaintiff offered in evidence, without qualification, certain documents which established the contract of carriage; that prompt and timely notice of arrival was given and the services for which the carrier charged.

As upon this showing, plaintiff claimed a violation of duty by the carrier, it is necessary to consider what that duty was. Both carrier and shipper's duty are defined by the applicable tariff. The shipper had to properly prepare the goods for shipment, load the car and give the carrier such instructions for protection as he saw fit. The duty of the carrier was to furnish, without negligence, reasonable protective service of

the kind and extent directed or elected by the shipper. Carriers are not liable for any loss or damage that may occur because of the acts of the shipper or because his directions were incomplete, inadequate or ill-conceived. The condition of perishable goods is not guaranteed by carriers who do not undertake to overcome the inherent tendency of perishable goods to deteriorate or decay, but merely to retard such deterioration or decay insofar as may be accomplished by reasonable protective service of the kind and extent requested by the shipper, performed without negligence: Perishable Protective Tariff No. 15.

The trial judge had before him evidence that the shipper approved the car, loaded it, iced it to his own satisfaction and delivered it to the carrier with instructions to fill the bunkers when the car got to an icing station and not to re-ice thereafter. That the carrier filled the bunkers with 16,000 pounds of ice at Fresco, Calif.; that, when loaded, the lading was affected to some extent by slimy decay but it was rated by a Government inspector as U. S. No. 1; that when the car arrived at its destination at Kansas City, Mo., it was reconsigned to plaintiff at Philadelphia; the car was re-iced at Chicago and arrived at Philadelphia with more than a foot of ice over the lettuce and with ice in the crates; that when opened first, the temperature in the car was 35 degrees and later in the day 36 degrees; that three days later, when slight cracks were found in the plugs to the bunker hatch, the bunkers were three quarters full of ice or better, the temperature was still 36 degrees and 36 degrees was shown to be the proper temperature required to preserve lettuce.

Plaintiff rested but then asked and was granted leave to reopen his case and offer the tariffs in evidence.

The law, we think, is simple enough and well established. A bill of lading is like any other contract in

that to recover thereunder there must be proof from which a breach of its provisions may be inferred. The carrier did not undertake to receive, carry and deliver lettuce graded U. S. No. 1. This shipment was perishable and, at least, plaintiff had to bring evidence from which it might be inferred that the carrier had failed to comply with the instructions it had received and damage had consequently resulted. If he did this, the carrier then had the burden of bringing itself within the exceptions of the contract; in short, show freedom from negligence.

The proof is that a considerable portion of the shipment was affected by decay, and decay is a progressive process; that the shipper gave certain instructions as to icing and that the carrier obeyed those instructions; that when the car was tendered for delivery, the lading was not rated U. S. No. 1 and from this it might reasonably be inferred that the decay had progressed generally, if the inspection had covered the lading or a considerable portion of it. However, it was in terms restricted to a few of the 318 crates, and when plaintiff showed that, at destination, the car was adequately iced, for it was maintaining a low temperature admittedly sufficient to preserve the lettuce, the inference appears inescapable that any decay was due to inherent vice in the consignment.

No inference can be drawn that the cracks in the bunker hatch affected the lading, for the ice in the bunkers and in the car sufficed to maintain the proper temperature to preserve lettuce. Furthermore, the car was accepted by the shipper as suitable, and he took the responsibility of loading it for shipment.

The most that can be said for plaintiff's proof is that it no more supports an inference that the carrier was at fault than it supports inferences that damage was due to inherent vice or insufficient icing, for neither of which the carrier is liable. It is not enough

to impose liability in this or any other kind of case for a plaintiff to show that damage may be due to different causes for only one of which defendant may be liable.

We think the trial judge was right in holding there was no evidence to go to the jury on the question of liability. The carrier was not an insurer, the damage was not due to delay and it was not due to failure to carry out the shipper's instructions, for they were strictly complied with. There is not a line of testimony that will support an inference that the carrier breached the contract.

We also find the proof to be inadequate on the question of damages. It appears to be the practice in the produce business to buy goods by sample, and it is certainly a ground for rejection if they do not come up to the sample, but exactly how this practice may support plaintiff's contention that it is a custom binding on a carrier to pay for a large consignment of lettuce because a few crates selected as samples are under grade, we are at a loss to discover.

If the railroad company was at fault, it could only be compelled to pay an ascertained loss. Plaintiff made no attempt to sell the property and while he said that in his opinion the carload of lettuce was worthless, as he never saw the car and based his opinion on what someone else told him, this testimony was objected to and stricken out. He offered the market report for May 2nd in evidence which showed that best California lettuce was at $5.50 per crate, poorer $2 to $2.50 and that four dozen ordinary to fair sold at $2.75 to $3.

This will not help plaintiff, for there is not a scintilla of testimony that would enable a jury to even make a reasonable guess into what classification any number of these crates would fall, how many were good, how many fair and how many poor; or as the price for fair and poor varied, due presumably to the

quality in particular crates, how much would have been realized on those grades.

The crucial question here is what the lettuce was worth on May 2nd when plaintiff might have sold it or tried to do so. But by his own action, plaintiff has made it impossible for anyone to determine what his loss, if any, was on the date it had to be determined.

We are not unmindful of the fact that after May 2nd the carrier's liability was merely that of warehouseman and certainly no negligence is either charged or shown after any liability as common carrier had ceased. We think this immaterial as the carrier's liability was not that of an insurer.

That this consignment had a value on May 2nd is unquestionable. It was plaintiff's property, but not until May 5th did he refuse to accept it. Defendant could not lawfully dispose of plaintiff's goods without some legal formalities but when these had been complied with, it sold the carload on May 10th for $352.

We find no merit in the contention that expert evidence was improperly excluded, for we think the witnesses were either unqualified or asked improperly phrased questions. They were, however, permitted to say that shipments graded U. S. No. 1 generally arrived at destination in the same grade. This was as much as they could say and would not have taken the case to the jury.

We are not unaware of the fact that despite the order not to re-ice, the shipment was re-iced at Chicago, but it is to be noted that the order only applied as far as Kansas City and when it reached that point, plaintiff was the owner. While there is no evidence who ordered re-icing at Chicago, no one but plaintiff had any right to give orders, and there is no evidence that the carrier volunteered the service. In any case, it could not damage the shipment, and it is not asserted or contended that it tends to establish liability.

As we think the nonsuit was properly entered, the motion to take it off is overruled.